IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 19, 2016 Session

## GAI D. KUOT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1529      Monte Watkins, Judge**

_____

**No. M2016-00485-CCA-R3-PC – Filed December 21, 2016**

_____

A Davidson County jury convicted the Petitioner, Gai D. Kuot, of first degree premeditated murder, first degree felony murder, and especially aggravated robbery.  On appeal, this Court affirmed his convictions and sentence.  *State v. Gai D. Kuot*, No. M2012-01884-R3-CD, 2013 WL 4539020, at *1 (Tenn. Crim. App., at Nashville, Aug. 26, 2013), *perm. app. denied* (Tenn. Dec. 11, 2013).  The Petitioner filed a petition for post-conviction relief in which he alleged that he had received the ineffective assistance of counsel because his trial counsel had failed to obtain a translator to explain to him his rights.  After a hearing, the post-conviction court denied the petition.  We affirm the post-conviction court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Jamaal L. Boykin, Nashville, Tennessee, and for the appellant, Gai D. Kuot.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Glenn R. Funk, District Attorney General; and Deborah M. Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A.  Trial

This case arises from the killing of the victim, which occurred in April 2010.  Because of the length of the facts presented by this Court in our opinion on the Petitioner's direct appeal and the issues in this post-conviction appeal, we will briefly summarize the facts supporting the Petitioner's conviction.  *Kout*, 2013 WL 4539020, at

*1-21.

The victim was a "Lost Boy" refugee from Sudan and obtained employment at Montgomery Bell Academy ("MBA") as a custodial worker through a charity in 2004. He earned $23,000 annually. The State charged one of his roommates, the Petitioner, with his murder. Trial testimony showed that the victim got along with his fellow employees and remained employed at MBA until his death in April 2010. The victim's shift at MBA on April 20, 2010, the day of his murder, started at 1:00 p.m. and ended at 10:00 p.m. The victim also had a side business in which he sold long distance phone cards to other members of the refugee community. For this business, he often carried a large roll of cash in his pocket. One of the victim's co-workers testified that he saw the at work the evening before his murder. The victim told his co-worker that he was going to Kroger after his shift and then going to pick up one of his roommates in Gallatin. The victim did not say which roommate.

Police responded to a call on April 21, 2010, about an injured man. When Sergeant Mitch Kornberg arrived at the scene, he saw the victim sitting on the ground, leaning against a chain-link fence. The victim had been shot multiple times and was dead. The sergeant noted that the victim was wearing a maroon MBA shirt with tan pants and a name tag on a lanyard around his neck. Also, in his lap were calling cards or credit cards. An autopsy revealed that the victim died as a result of eight gunshot wounds.

The police investigation revealed that the victim had immigrated to the United States in 2004 from Sudan. The victim's cousin, William Deng, who had himself immigrated to the United States in 1995, became roommates with the victim and the Petitioner sometime in 2009. The victim and the Petitioner each occupied their own bedroom, and Mr. Deng slept on the couch. Mr. Deng testified that he owned a PT 92 Beretta nine-millimeter because his employment required that he carry a gun. He owned two magazines for the weapon. He kept one inside the weapon and the other in the glove box of his Nissan Pathfinder. Mr. Deng kept the weapon hidden between the driver's and passenger's seats of his vehicle. On April 12 or 13, 2010, Mr. Deng discovered that his gun was missing, and he called the police. His car was locked and showed no signs of forced entry, and the person who stole the weapon did not take the extra magazine. Mr. Deng said that he routinely kept his keys on the kitchen table of the apartment that he shared with the victim and the Petitioner and that the Petitioner knew he kept a weapon in his car.

Mr. Deng recalled that the victim would purchase telephone calling cards in bulk and then would sell them to members of the Sudanese community in Nashville. He often conducted these transactions in a coffee shop on Murfreesboro Road, which was a popular establishment among Sudanese men. Mr. Deng recounted that the victim often

2

carried with him the money earned during the transactions.

Mr. Deng testified that he fell asleep on the couch the night before the murder, and neither the Petitioner nor the victim was present. He was awoken the next morning by police officers. He said that the Petitioner exited his room wearing street clothing rather than clothing in which he normally slept, which surprised him. The Petitioner, who was unemployed, told the police officers that he had not spoken with the victim the previous evening. The Petitioner and Mr. Deng both went to the police station to speak with police.

Kroger surveillance footage from April 20, 2010, showed a man, who appeared to be either the Petitioner or the victim entering the Kroger store at 11:31 p.m. and leaving alone at 11:35 p.m. The quality of the video was not clear. A witnesses near the scene of the shooting heard two or three gunshots at around 12:30 a.m. on April 21, 2010. The victim's car was found near where his body was found, and there were two bullet holes in the driver's side of the car that appeared to have been fired from the interior of the car. Police found the victim's wallet on the ground near the vehicle.

Other officers searched Mr. Deng's and the Petitioner's vehicles. Evidence collected from the Petitioner's vehicle, a white Volvo, included four phone cards and two Western Union receipts. The Western Union receipts indicated that "Gai Deng," which was the name the Petitioner gave to police, wired $100 to Uganda at 2:30 p.m. on April 20, 2010, the day leading up to the victim's murder, from a Western Union located at a Kroger on Charlotte Pike.

The Petitioner's friend, Dennis Ogwang, testified that he played cards with the Petitioner on Sunday, April 18, 2010, but not on Tuesday, April 20, 2010. Mr. Ogwang said that police contacted him about this murder. Before he went to the station to speak with them, the Petitioner called him and asked him to tell the police that the Petitioner and Mr. Ogwang were playing cards together on the night of the murder. When he spoke with police, Mr. Ogwang told them about the Petitioner's request. He also called the Petitioner while in the presence of police, and the Petitioner told him to "[j]ust tell them that I was with you playing cards."

A witness, Yvonne Claybrooks, said that, on April 21, 2010, she and her neighbor saw a white, four-door Volvo that had a yellow marking on one of its tires in front of a vacant lot next to her house. She saw a black arm reach out the window and throw a red jacket over the car and into a ditch. She could not see the driver's face because of the window's dark tint. After the car drove away, the witness and her neighbor walked down to the ditch to see what had been discarded, and they found a stack of phone cards in the jacket. Later that day, another neighbor, Royce Cavender, saw the jacket lying in the

3

ditch next to a stack of cards. He found this unusual, so he called the police. Ms. Claybrooks testified that the following day police searched the location where the jacket had been thrown. They found the jacket, and forensic testing showed that the victim's blood was on the right cuff of the jacket. Further testing showed an area of DNA from which the forensic analyst could not exclude the Petitioner or the victim as being the contributor.

As officers were searching the location where they found the jacket, Ms. Claybrooks saw the white Volvo drive down her street. Ms. Claybrooks went to police and told them about what she had seen. Two detectives present at the scene saw the Petitioner driving a white Volvo past them while they were looking for property near Ms. Claybrooks's home. One of the detectives noted that Ms. Claybrooks's home was located near where the Petitioner lived at the time.

The next day, Ms. Claybrooks observed a man walking up and down her street looking into the ditch. She noted that he was wearing flip flops, which she found unusual, so she called the detective associated with this case. He came and showed her a photographic lineup from which she identified the Petitioner's picture as belonging to the man who was walking on her street.

Police officers interviewed the Petitioner twice on April 21, 2010, and then a third time. Detective Thompson said that, during the first interview, the Petitioner denied having seen or spoken with the victim since 12:30 p.m. on April 20, 2010, when the victim left their apartment for work. During the second interview, the Petitioner maintained that he had not spoken with the victim by cell phone on April 20, 2010. Detective Thompson obtained the victim's cell phone records, which showed that, contrary to the Petitioner's statements, there had been several phone calls between the Petitioner's and the victim's phones between 10:30 p.m. and shortly after midnight on April 20, 2010. Phone analysis revealed that there were multiple calls between the Petitioner's and the victim's phones on the night of the murder, with the final communication occurring at 12:13 a.m. At that time, both phones "pinged" off of the towers closest to where the victim's car was found.

Detective Thompson said that the Petitioner gave them permission to look through his cell phone. When Detective Thompson did so, he noticed and wrote down a number for a contact identified as "Dennis." Later, during his interview with the Petitioner, the Petitioner said he had been with "Dennis" on the night of the murder. The detective asked the Petitioner for Dennis's number. The Petitioner looked through his cell phone and then said that he did not have Dennis's contact information. The detective looked at the phone and noted that the contact for Dennis had been deleted. Further investigation showed that the Petitioner had written checks from the victim's checking account. The

4

Petitioner initially claimed that the victim had written the checks to him but later said that the victim had just given him the checks. The parties stipulated that the Petitioner had written six checks on the victim's account, totaling $800. The checks were made out to the Petitioner, and the Petitioner had forged the victim's name on the checks before cashing them.

The detective obtained video surveillance from a pawn shop showing the Petitioner looking at guns a month before the murder. He also found information indicating that the Petitioner owed the State of Tennessee for overpayment of unemployment benefits and owed money to a college in Michigan.

The Petitioner testified that the victim was his best friend and like a brother to him. The Petitioner said that he had previously loaned the victim $900 and that the checks made out to him were a repayment of that loan. The Petitioner said the victim did not read or write very well in English, so he often had the Petitioner fill out checks on his behalf. The Petitioner said that he had forgotten that he spoke with the victim the night of the murder, recalling that the two did speak and discussed an election that was happening in Sudan. The Petitioner said he was playing cards in Antioch at the time of the murder and that he got back home to his apartment at around midnight. He opined that "Dennis" and another man denied playing cards with him that evening because they were afraid of the police.

The Petitioner said that the victim and Mr. Deng had gotten into an argument after the victim refused to loan Mr. Deng $200. The Petitioner said that the victim told Mr. Deng that he had to move from the apartment. The Petitioner denied throwing a red jacket on the side of the road. He denied that he needed money. The Petitioner asserted that both Mr. Ogwang and Ms. Claybrooks had lied in their testimony.

## B. Post-Conviction Hearing

Counsel testified that he represented the Petitioner during his trial. He said that he and the Petitioner never discussed the need for an interpreter. Counsel acknowledged that he knew that the Petitioner was from Sudan. Counsel believed that, at the time he represented the Petitioner, the Petitioner had been in the United States for three or four years. Counsel said that, while in the United States, the Petitioner had been employed in Nashville and had attended one or two years of college. Counsel said that the Petitioner never mentioned using an interpreter at college.

Counsel said that he never had a problem talking with the Petitioner "at all." Counsel gave the discovery to the Petitioner, and the Petitioner apparently could read it. The Petitioner did not ask Counsel to read it to him and did not ask for an interpreter.

5

Counsel said the Petitioner appeared to understand him "perfectly well."

Counsel said he reviewed the evidence with the Petitioner, and the Petitioner never indicated that he had any problem understanding their discussion. Counsel said that, throughout the trial, the Petitioner never expressed difficulty in understanding the proceedings or testimony. Counsel said that the Petitioner did not make "a very good witness" testifying on his own behalf because he lied, which came through during his testimony.

Counsel agreed that he sometimes had to ask the Petitioner to repeat himself while he was testifying. He agreed that this may have been caused by his difficulty in understanding the Petitioner's response. He also agreed that some of the Petitioner's responses were not entirely grammatically correct, but he said that the Petitioner effectively conveyed his testimony.

Counsel said that the Petitioner offered him an alibi for the evening of the murder, which was the same alibi he offered to police. The men that the Petitioner said he was playing cards with, however, denied being with the Petitioner the night of the murder. Counsel said he never filed a notice of alibi with the State because he could never verify the alibi.

Counsel said he understood that the Petitioner would be cross-examined if he testified, but he never considered the need for an interpreter. Counsel said he never investigated whether there were interpreter services available to the Petitioner because he never believed that they were necessary. He said his duty was to ensure that the Petitioner understood the trial and his rights, which was what he did.

During cross-examination, Counsel testified that during the course of his two-year representation of the Petitioner, he spoke with him extensively. He said that he tried to talk the Petitioner out of going to trial because he believed that the State had a "very good circumstantial case" against the Petitioner. Counsel said that he thought that the Petitioner had an "overwhelming chance of being convicted." Counsel testified that, during these conversations, he never doubted that the Petitioner understood him, and the Petitioner never expressed a lack of understanding.

Counsel testified that he reviewed the police video recorded interviews with the Petitioner. In the interviews, the Petitioner never said that he needed an interpreter. Further, he offered the police an alibi. Counsel said he also had two doctors, Dr. Pamela Auble and Dr. Kimberly Brown, interview the Petitioner, and neither indicated any difficulty understanding the Petitioner.

Counsel said that, during the Petitioner's trial, the Petitioner never asked anyone to stop or slow down based upon his lack of understanding English. Counsel identified the Petitioner's petition for post-conviction relief, and he noted that the Petitioner had filled out the document himself, indicating his level of understanding of the English language. Counsel said that the Petitioner could read and write English, noting that the Petitioner had written some things to him about his trial. Counsel said he "never had any problem communicating with [the Petitioner] and he never in[dicated] to [Counsel] that he was having problems with communication."

During redirect examination, Counsel said that the Petitioner was "nearly always pretty hostile" towards Counsel. Counsel felt the Petitioner had a "bad attitude" in that he was confrontational and demanding.

The Petitioner testified through an interpreter. He said that Counsel never told him that he had the right to an interpreter to understand the proceedings. He said that he had been in the United States for ten years, five years of which he was incarcerated. The Petitioner said that it was untrue that he had attended college. The Petitioner could not explain why he owed a university money.

The Petitioner said that his native language was Dinka and that he was from Sudan. He went to school in Sudan, where the teacher was English. The English was translated to Dinka for the students. The Petitioner said that, even in the United States, he spoke Dinka to his friends. He said that he spoke with his attorney and to other doctors in this case and that he told them that he did not understand some of what they were saying. However, none of the people he spoke with told him that he was entitled to an interpreter. He said that he did not learn that he could get an interpreter until he was incarcerated. The Petitioner said that he had never before been in legal trouble, so this was a new experience for him.

The Petitioner discussed his decision to testify. He said that Counsel never told him that he had a right not to testify or that the jury could not hold against him a decision not to testify. The Petitioner acknowledged that he drafted his petition for post-conviction relief. He said that it took him three or four months to draft and that "people" in prison helped him draft it.

During cross-examination, the Petitioner testified that he worked at Wal-mart after he came to the United States. The Petitioner denied ever going to college in Michigan. The State then read to him his trial testimony where he said "Back in 2007 when I was in Michigan, when I was in college in Michigan, he sent me a hundred dollars . . . ." The Petitioner maintained that he never went to college in Michigan. The State later asked the Petitioner if he went to Lansing Community College in Michigan. The Petitioner said

7

he did not. The State noted that it had introduced evidence at trial showing that he went to that school, and the Petitioner maintained that he did not.

The Petitioner agreed that he filled out his own petition for post-conviction relief. He said he received assistance with writing the document. The Petitioner agreed that law enforcement found multiple letters in his car, one of which showed that he had applied successfully for unemployment. The Petitioner agreed that he had three long interviews with the police and that, during the interviews, he did not need assistance answering their questions. The Petitioner agreed that Counsel gave him all of the discovery and that the two discussed it at length. He said, however, that he did not understand everything that Counsel said to him.

The State pointed out to the Petitioner that the record showed that, before he testified, he was informed that he had a right not to testify. The Petitioner said that he did not "know what is right and what is wrong." He then agreed that he wanted to testify and to "represent his ideas" but explained that no one told him that he did not have to do so.

The Petitioner agreed that, during his trial, his friends including Sammy Sabino testified in English. The Petitioner agreed that he bragged to police that his English was better than the victim's, but he said that he was talking "about writing and not speaking. I can write my name, and that is what I said. And some people they don't know how to write their name."

Based upon this evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief. It found that the Petitioner's testimony was not credible. The post-conviction court noted that the Petitioner did not indicate at any time during the trial or case preparation that he did not understand English. The court further noted that Counsel testified that the Petitioner was able to communicate with him and participate in his defense.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because Counsel was ineffective for failing to secure him an interpreter for the Petitioner. In support of his argument, he notes that he had only been in the United States for five years at the time of the trial. He asserted that he had no formal training or education in speaking English and that he did not understand any of the rights that Counsel explained to him. The State counters that during the two-year time period over which Counsel represented the Petitioner, Counsel never noted any difficulty

communicating with the Petitioner. Further, the State notes that the Petitioner attended college in the United States and appeared to fully understanding the questions posed to him by law enforcement during his three long interviews. The State asserts that the Petitioner did not prove by clear and convincing evidence that Counsel was ineffective for failing to obtain him an interpreter. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a Petitioner in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

We conclude in the case under submission that the Petitioner has failed to show that trial counsel's performance was deficient or that trial counsel's performance caused him to suffer prejudice at trial. Counsel testified that he met with the Petitioner numerous

times over the course of his two years representing him. He said he had no difficulty communicating with the Petitioner. The two doctors who interviewed the Petitioner also did not have difficulty communicating with him. Counsel reviewed the Petitioner's interviews with police, during which the Petitioner answered their questions appropriately, provided them with an alibi, and did not express any lack of understanding. The Petitioner testified at his trial that he attended college in Michigan, supported by a bill to the school found by police in the Petitioner's vehicle. The Petitioner filled out his own petition for post-conviction relief. The post-conviction court credited Counsel's testimony and found the Petitioner's post-conviction testimony not credible, and we will not reweigh or reevaluate credibility determinations on appeal. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009). The Petitioner is not entitled to relief.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

11